MICHIGAN CENTRAL RAILROAD CO. *v.* HALE.

## The Michigan Central Railroad Company v. Lorenzo D. Hale and Others.

Section fifteen of the charter of the Michigan Central Railroad Company provides that "it shall and may be lawful for the said Company, from time to time, to fix, regulate, and receive tolls and charges taken for transportation of property and persons on said railroad as aforesaid, and for the storage of property remaining in the depots of said Company, if not taken away as hereinafter provided," &c.; and the sixteenth section provides that "the said Company may charge and collect a reasonable sum for storage upon all property which shall have been transported by them, upon delivery thereof at any of their depots, and which shall have remained in any of their depots more than four days : *Provided,* That elsewhere than at their Detroit depot, the consignee shall have been notified if known, either personally, or by notice left at his place of business or residence, or by notice sent by mail, of the receipt of such property, at least four days before any storage shall be charged, and at the Detroit depot such notice shall be given twenty - four hours (Sundays excepted) before any storage shall be charged; but such storage may be charged after the expiration of said twenty-four hours upon goods not taken away : *Provided,* That in all cases the said Company shall be responsible for goods in deposit in any of their depots, awaiting delivery, as warehousemen, and not as common carriers. And if said Company shall charge or take any renumeration for storage of goods otherwise than aforesaid," a penalty is imposed therefor. Under this last proviso of the sixteenth section, property in deposit in the depots is to be considered as "awaiting delivery" as soon as it is in condition to be delivered over to the consignee when demanded, and not merely from the time when the right to charge for storage has accrued.

The office of the notice contemplated by the sixteenth section is only to fix the right to charge for storage, and not to continue the liability of the Company as common carriers. If the necessity of notice to terminate the carrier's liability did not exist without, it was not created by, this section; while, if it did exist, it is removed by the limitation of liability to that of warehousemen where goods are in deposit and in situation to be delivered, whether such notice be or be not given.

A common carrier can not limit his common law liability by a mere notice endorsed upon the receipt given the consignor, or otherwise brought to the consignor's notice. The assent of the latter to the limitation is necessary, and must be proved by evidence *aliunde*—it can not be presumed from the terms of the receipt alone, or be implied from the posting of notices or the delivery thereof to the consignor.

A common carrier has no power to *restrict*, in any manner, his common law liability, but it bound to transport the property intrusted to him under this liability, if it be not waived, or changed by contract. But he may make any contract with an individual relative to the transportation of his property which the latter may deem conducive to his interest, and enter into upon a consideration satisfactory to himself, though a diminution of the carrier's common law liability results therefrom.

The law does not compel persons dealing with common carriers to rely and insist upon the liability which, in the absence of special contract, it imposes in their favor, but recognizes their competency to manage their own affairs, and to make such contracts with respect thereto, as they may deem most conducive to their interests.

MICHIGAN CENTRAL RAILROAD CO. *v.* HALE.

A corporation which is made a common carrier by its charter, and required to "transport merchandise and property without showing partiality or favor," has the same power to contract for a limitation of its liability as any other carrier, and no consideration of public policy is contravened by the exercise of such power.

The case of *The Michigan Central Railroad Company v. Ward*, 2 *Mich.* 538, overruled.

*Heard November 13th, 16th, and 17th,* 1858.  *Decided January 13th.* 1859.

Error to Jackson Circuit.

Hale and Smith brought assumpsit against the Michigan Central Railroad Company, for the value of certain wheat delivered to the Company as common carriers, to be carried by them from Grass Lake to the city of Detroit. Upon the trial, the following facts appeared in evidence:

In and prior to November, 1850, defendants (below) were common carriers, incorporated by an act of the Legislature of the State of Michigan, approved March 28th, 1846. As such common carriers, prior to the night of November 18th, 1850, they received from plaintiffs 7803 and 34-60ths bushels of wheat at Grass Lake, consigned to plaintiffs themselves, and to be delivered at the depot of defendants in the city of Detroit. This wheat was carried by defendants to Detroit, and there deposited in their warehouse, with the exception of the last car load of 404 and 43-100ths bushels, which was not unloaded. On the night of November 18th, 1850, the said warehouse was destroyed by fire, and all the wheat then remaining deposited therein burned and destroyed, except a small portion subsequently sold as damaged wheat. The wheat had been delivered to defendants in different amounts, and at different times, from October 26th to November 18th. On the 7th of the last month, plaintiffs contracted to sell 7000 bushels of wheat to Charles Howard, and gave him an order on defendants, directing them to deliver to Howard that amount. This order was subsequently presented, and a portion of the wheat received upon it.

Receipts, similar in form, were given by defendants for the wheat as it was delivered to them. The following is a copy of one of these receipts:

"MICHIGAN CENTRAL RAILROAD COMPANY.

"*Grass Lake*, Oct. 26, 1850,

"*Recd. from Hale, Smith & Co., as consignors, the articles marked, numbered, and weighing as follows:*

| ARTICLE. | MARKS AND NUMBERED. | WEIGHT. |
|---|---|---|
| One car of wheat in bulk. | | |
| Car No. 4966. | . | 24,206. |

*To be transported over the said Railroad to the depot in Detroit, and there delivered to Hale, Smith & Co., or order, upon the payment of the charges thereon, and subject to the rules and regulations established by the Company, of which notice is given on the back hereof.*"

WM. H. PEASE, Freight Agent, M. C. R. R. Co."

(Endorsed on the back):

"ABSTRACT FROM THE RULES AND REGULATIONS AS PER PUBLISHED FREIGHT TARIFF.

"The Company will not be responsible for damages occasioned by delays, from storms, accidents or other causes, as by decay of perishable articles, by heat or frost to such as are affected thereby, or for damages to the hidden contents of packages, or by leakage or bursting, or by reason of improper packing when received at their depot; nor will it be responsible for any merchandise, unless receipted for by a duly authorised agent; nor for a greater amount than $200 on any one package, except by special agreement, and upon payment of extra rates; and all goods and merchandises will be at the risk of the owners thereof while in the Company's warehouses, except such loss or injury as may arise from the negligence of the agents of the Company. Goods consigned to irregular stations (those not in capitals on the Freight Tariff), will be delivered at the nearest regular station unless the owner gives a written order to deliver them at the irregular station at his risk."

It further appeared in evidence that plaintiffs were large shippers of wheat over defendants' road in 1849 and 1850.

Of the wheat received by defendants from plaintiffs, that portion not included in the Howard order remained undelivered at the time of the fire.

The defendants requested the circuit judge to charge the jury:

1st. That if the jury find that defendants received the property in question, to transport to their depot in Detroit, that they did so transport it, and there deposited it according to the usual course of business, in their warehouse at Detroit, their liability from the time of so depositing it, would be that of warehousemen, not common carriers.

2d. That section 16 of defendants' charter only controls their right of charging after the notice therein provided for, and does not continue their liability as common carriers after the property is delivered in their warehouse, and until after the giving of such notice.

3d. That even if the notice mentioned in said section 16 was necessary in ordinary cases to discharge the liability of defendants as common carriers, yet if the jury find that the wheat in question was delivered by plaintiffs to defendants, and consigned to themselves at Detroit, no special notice by defendants to plaintiffs of the arrival of the wheat was necessary, as it will be presumed plaintiffs had knowledge of the time it would arrive at Detroit.

4th. That defendants had a right, by contract with plaintiffs, to limit their common law liability; and if the jury shall find by the terms of the receipt given by defendants to plaintiffs in this case it was stipulated between them that all goods and merchandises would be at the risk of the owners thereof while in the defendants' warehouses, except as to such loss or injury as might arise from the negligence of defendants' agents, such stipulation will define and limit the liability of defendants in this case.

The circuit judge declined to charge as requested on all the points, and defendants excepted. Judgment having been rendered for plaintiffs for the value of that portion of the

MICHIGAN CENTRAL RAILROAD CO. *v.* HALE.

wheat not included in the order to Howard, defendants brought error.

*G. V. N. Lothrop*, and *Wilcox & Gray*, for plaintiffs in error:

1. A common carrier may limit his common law liability by express contract.—4 *Burr.* 2301; 5 *East*, 513; 16 *East*, 244; 3 *Taunt.* 264; 8 *Taunt.* 144; 2 *M. & S.* 1; 4 *B. & Ald.* 39; 2 *B. & Ald.* 356; 3 *B. & C.* 601; 5 *B. & C.* 222; 1 *Stark.* 186; 1 *H. Bl.* 298; 4 *Bing.* 218; 5 *Bing.* 217; 8 *M. & W.* 443; 7 *Eng. L. & Eq.* 395; 11 *Ibid.* 506; 22 *Ibid.* 315; 25 *Ibid.* 396; 13 *Barb.* 353; 14 *Barb.* 524; 4 *Sandf.* 136; 5 *Sandf.* 180; 1 *Kern.* 491; 16 *Penn.* 67; 5 *Rawle*, 179; 6 *W. & S.* 495; 9 *Watts.* 87; 8 *Penn.* 479; 4 *Harr. & J.* 317; 23 *Vt.* 186; 26 *Vt.* 247; 2 *O. S. R.* 132; 11 *Cush.* 97; 12 *B. Monr.* 63; 2 *Rich.* 286; 31 *Maine*, 228; 3 *Fairf.* 422; 6 *How.* 344.

It makes no difference that the carrier is a corporation. The Company is empowered to carry goods by their charter. In the exercise of this right, except so far as they are limited or restrained by their charter, they may do what an individual might do, and they are subject to the same liabilities and responsibilities as an individual in the same circumstances. Where a general capacity is conferred, it is to be exercised precisely as an individual would exercise it.—12 *Barb.* 53; 1 *Sandf. Ch.* 380; 15 *N. Y.* 63, 64.

2. No notice of the arrival and deposit of the goods in the Company's warehouse was necessary. The liability of the Company as a carrier ceases, either at once upon placing the goods in the warehouse, or at most upon the lapse of a reasonable time thereafter for their removal by the consignee. —*Redf. on Railw.*, § 130; 10 *Metc.* 472; 1 *Gray*, 263; 32 *N. H.* 523; 3 *Dana*, 92. This is the general rule deduced from the authorities. The same rule is prescribed for this Company by sec. 16 of their charter, which provides that the " Company shall be responsible for goods in deposit in any of their depots, *awaiting delivery*, as warehousemen, and not as com-

mon carriers." There are only two classes of goods in their depots — one *awaiting carriage*, and the other *awaiting delivery*. The notice provided for in the preceding part of the section relates to charging storage, and to that only.

3. When, as in this case, the consignor is himself the consignee, we claim that he is not entitled to notice of the arrival of goods, even if consignees usually are. The consignor is bound to know, and to take notice, of the regular course of business of the Company. He knows, therefore, of the time of arrival of the goods at their destination. — *Redf. on Railw.* § 139; 32 *N. H.* 523.

The consignors live at Grass Lake. Notice, if any, must be sent to them there, and time must be allowed them to receive the notice, and then to come to Detroit to receive the goods. Now, can it be said that the consignor contemplates that this shall be done? It seems to us clear that he expects and intends that the property shall go to Detroit by due course of business, and there remain in warehouse till the consignee shall go there, or send an order for it. And so the Railroad Company understands it.

*Johnson & Higby*, for defendants in error:

1. The Company are liable as common carriers until notice to the consignee, and until a reasonable time for the removal of the property should thereafter elapse. — *Mich. C. R. R. Co. v. Ward*, 2 *Mich.* 538.

The positive provisions of section 16 of their charter are that the Company may collect reasonable storage upon all property transported by them, and which shall have remained in their depot more than four days. This was an essential enlargement of their powers, without which no storage could be collected, because it did not come within the general scope and design of the corporation. Then follows the first proviso which is partly in the nature of a limitation, and partly in the nature of a grant or covenant. For all depots except Detroit, it limits the right to collect this storage to those

cases where four days' notice has been given; but in regulating the exercise of that right in reference to goods in the depot at Detroit, it amounts to a grant, because it authorizes the collection of storage in twenty - four hours after notice, although four days, as previously provided, had not elapsed. Then follows the second proviso, which is also in the nature of a contract, having strict reference to what had preceded, regulating and defining the rights of the Company.    It declares the Company shall be responsible as warehousemen, and not as common carriers, for goods *awaiting delivery*. When are goods "*awaiting delivery*"?   If we recur to the positive provisions of this section, and the first proviso, we find this phrase corresponds precisely with the time when the Company may assume the duties of warehousemen; namely, after four days' notice out of, and twenty - four hours' in, the city of Detroit.   It is not unreasonable to suppose that the liability of the Company as warehousemen should commence with the commencement of their duties as such.   If they are not liable as carriers up to that time, in what capacity are they liable ?   At common law, they would be liable as carriers until they assumed the duties of warehousemen; and to discharge them from that liability would require a positive legislative enactment, free from ambiguity.   If we undertake to say that this last proviso is of that character, we give no force or effect to the phrase "awaiting delivery"; because, by omitting those words it would, in the most simple and natural language, express that idea.   We must give them *some* meaning; and it is clearly no other than that which relates to the condition of the parties, as well as of the goods.   If the consignee is not in condition to receive the goods, as he clearly is not if he has no knowledge of their arrival, they are not awaiting "delivery."

The carrier must discharge all his duties as such, before any duty can be imposed upon the consignee.   This is not done until he has given notice.   The law then fixes a reasonable time for the consignee to remove his goods, and if there

6 Mich.—R.

is any reason for continuing the liability of the Company beyond the deposit of the goods, the same reason would exist until the consignee has had a reasonable time to take possession.

2. There is no reason why the consignor, when himself, the consignee, should not have the same notice as other persons. As a general rule he would have no better means of knowing the time of arrival than any other consignee.

3. The Company having undertaken to become common carriers, any attempt on their part to limit or restrict their liability as such, is inconsistent with the undertaking, against public policy, and therefore inoperative and void. As to what is a common carrier, see 2 *Kent*, 498 ; *Ang. on Car.* § 67 ; *Coggs v. Barnard*, 2 *Ld. Raym.* 909.

This Company, by their charter, have agreed with the Government to assume the duties of this public employment; and they can not now, in violation of that agreement, divest themselves of that character, and discharge themselves of the *public* duty thus undertaken, by imposing special contracts upon individual members of the community.

An ordinary common carrier, having assumed this character at his will, may, at his own will, divest himself of it at any time he may choose, and rely upon his special contract. He is then no longer a common carrier. — 6 *How.* 344. But this Company has entered into an engagement, irrevocable in its nature, to be and continue a common carrier, and are not therefore at liberty to divest themselves of that character, and to throw off their duties and liabilities as such whenever it may suit their convenience. — *Hollister v. Nowlan*, 19 *Wend.* 240; *Hyde v. Trent & Mersey Nav. Co.* 5 *T. R.* 387; *Mich. C. R. R. Co. v. Ward*, 2 *Mich.* 538.

MARTIN Ch. J.:

The first question presented in this case is, whether, after goods transported by the Railroad Company have arrived at

their place of consignment, and have been deposited in such Company's warehouse, according to the usual course of business, the Company's liability, from the time of so depositing them, would be that of warehousemen, or that of common carriers. The consideration of this question necessarily involves that of the second presented in this case, viz., the construction and effect of the sixteenth section of the Company's charter, — as this last contains really no independent proposition, but, as suggested by defendants' counsel, rather assigns a reason in support of the first. We will, therefore, consider the two as one.

The fifteenth section of the charter provides that "It shall and may be lawful for the said Company, from time to time, to fix, regulate, and receive tolls and charges taken for transportation of property and persons on said railroad as aforesaid, and for the storage of property remaining in the depots of said Company, if not taken away as hereinafter provided," &c.; and the sixteenth section provides that "The said Company may charge and collect a reasonable sum for storage upon all property which shall have been transported by them, upon delivery thereof at any of their depots, and which shall have remained in any of their depots more than four days: *Provided*, That elsewhere than at their Detroit depot, the consignee shall have been notified, if known, either personally, or by notice left at his place of business or residence, or by notice sent by mail, of the receipt of such property, at least four days before any storage shall be charged, and at the Detroit depot such notice shall be given twenty-four hours (Sundays excepted) before any storage shall be charged: but such storage may be charged after the expiration of said twenty-four hours upon goods not taken away; *Provided*, That in all cases the said Company shall be responsible for goods in deposit in any of their depots, awaiting delivery, as warehousemen, and not as common carriers. And if said Company shall charge or take any re-

muneration for storage of goods otherwise than as aforesaid, it shall forfeit and pay to the State of Michigan, in each case, for so doing, the sum of fifty dollars."

These sections determine the question when the liability of this Company as common carriers ceases, and as warehouse-men commences. Were it to be settled by the rules of the common law, much difficulty might be experienced in de-. termining it — a conflict existing as to whether notice is, or is not, necessary; or whether the lapse of time wherein the con-. signee, by the use of diligence, might remove his property, is, or is not, necessary; or whether any, and what, reasonable time is allowed him in which to remove his property before. the Company can be released from their liability as carriers. But we apprehend the rules of the common law can have no operation upon this question; and it is the resort to these rules, and the attempt to interweave one or the other of them into this charter, and so fix the liability of the Company, that has given rise to the doubts which surround it. The late Supreme Court, in the case of this Company *v. Ward*, (2 *Mich.* 538), held, that notice of the arrival of the property, and the lapse of the time allowed for its removal, were necessary, both by common law and under the charter, and that property could not be considered as *awaiting delivery*, within the meaning of the proviso to the sixteenth section, until after the expiration of the time limited for ·its removal. But, whether notice is required, or the use of diligence by the consignee, or whether neither, but the lapse of a reason able time, after arrival for its removal, is allowed, or all, in the absence of any provisions in the charter upon the subject, becomes immaterial when such provision exists.

The necessity of a notice before the right to charge for storage arises, is clearly determined by the sixteenth section, and the imposition of a forfeiture of fifty dollars, if it should be charged, or any remuneration taken therefor, except as therein authorized, seems to indicate that the charging for storage was the paramount subject of the section, and that

the proviso was inserted to avoid the presumption that the liability of the Company as carriers should continue until notice, or removal of the property, or any period of time after the property had been transported and deposited for delivery.

The fifteenth section empowers the Company to fix, regulate and receive tolls upon all goods remaining in their depots, if not taken away within the time fixed by section sixteen. This time is twenty-four hours when goods are in the Detroit depot, and four days if at any depot elsewhere, after notice of their arrival shall have been given. But, has the notice any effect upon the liability of the Company? It is claimed by the defendants in error that it has; because, 1st, The liability of carriers only ceases when that of warehousemen commences; and they claim that this is when the right to charge for storage commences: and, 2d, Because the Company are liable as carriers until the property is "awaiting delivery," which, as they insist, is not until after notice, and the lapse of the time limited for their removal without charge for storage.

But is it true that the Company can not be warehousemen unless the right to charge for storage exists?

That no interval can elapse between their laying down the character of carrier and assuming that of warehousemen is true, — and these characters are defined by the liabilities as well as by the rights attached by law to them. The right to charge storage is an incident to that of warehousemen, and, unless restrained by law, exists from the moment of the deposit of goods in a warehouse; but a restraint of this right does not divest the warehouseman of his character any more than the imposition of any other restraint upon his business would.

This Company are created a railroad and transportation company, and are consequently common carriers; but the Legislature, presuming that property, after transportation, might remain a longer or shorter time in their possession before being removed, regards their depots as warehouses,

and recognizes them as being warehousemen for goods thus remaining therein, but imposes upon them the duty of notifying the consignee of the arrival of his property, if they would make such continued possession the foundation of a right to charge for its storage. It nowhere, by express words, creates them warehousemen, but it recognizes them as such in regard to property deposited in any of their depots, awaiting delivery, and restricts their right to charge for storage of such property, notwithstanding it may be thus deposited, unless notice shall have been given. Accordingly, as we have seen, by the provisions of section fifteen they are empowered to receive tolls upon goods received into their warehouse, unless taken away under the conditions and restrictions contained in section sixteen; but lest these should be construed as extending their liability as carriers until the right to receive tolls should arise, or leave in doubt the time when such liability changed to that of warehousemen, it is provided that, notwithstanding this disability to charge for storage for a limited time, the character of warehousemen should commence at the time when the goods are deposited in the depot and ready for delivery. This is what is meant by the words "awaiting delivery." By this, we do not mean to be understood that the mere deposit of goods in the depot is sufficient.

The facts of this case show, however, that the property was not only deposited, but in a situation to be delivered when called for; and being in such situation, they were within the proviso. Now, property is "awaiting delivery" as soon as it is in a situation to be delivered over to the consignee, when demanded; and such must be held to have been the view of the Legislature, unless we can suppose that two rules of liability were intended, — one respecting goods in the Detroit depot, and another respecting goods in a country depot. For such a distinction there is no apparent reason, and the very inequality of the rule contended for, shows that none such was in contemplation of the parties to the charter.

It was urged (and such was the decision of this Court in,

the case against *Ward*), that the Legislature by the use of the term "awaiting delivery," had reference to the time which might elapse after the right to charge for storage accrued, and before removal of the property. But, for the purpose of shifting the liability of the Company as carriers to that of warehousemen, during this period, no such provision was necessary; as, by law, without any limiting proviso in the charter, such would be their liability during that interval of time, and the proviso, under such construction, becomes meaningless as a proviso.

Now, when a proviso is inserted in an act, its office is to limit the operation of such act, or to confine it to particular persons, or to a particular state of facts; and if it be held that the provisions of the charter respecting the collection of storage would primarily operate to continue the Company's liability as carriers until the right to collect it should arise, then the proper interpretation. of the proviso is that which shall limit this effect.   Otherwise, it is no proviso.   It was urged that "awaiting delivery" presupposes the consummation of every preliminary requisite to delivery, and consequently presupposes notice to the consignee, and the elapsing of the time limited for its removal.   But this is upon the assumption that notice, as well as reasonable time for removal, are common-law requisites to the discharge of a carrier's liability; and so long as these are open questions, it can hardly be assumed, we think, that the Legislature intended to incorporate into this charter, by the sixteenth section, either rule.   The presumption is, rather, that they designed to adopt a certain and independent rule relative to the liability of this Company, to avoid the uncertainties of the common law upon this subject.

Now, goods are in deposit in the depots of the Company, either awaiting transportation, or awaiting delivery. The section has reference only to goods which have been transported and placed in the Company's depots for delivery to the consignee, and this language of the proviso was em-

ployed to designate the situation of the property, and not to create a new liability from such condition.

The office of the notice contemplated by the sixteenth section, is, then, we think, only to affix the right to charge for storage, and not to continue the liability of the Company as common carriers; and, if the necessity of notice to terminate the carrier's liability did not exist without, it was not created by, it; while if it did exist, it is removed by the limitation of liability to that of warehousemen when goods are in deposit, and in a situation to be delivered, whether such notice be or be not given.

There was, therefore, error in the refusal of the circuit judge to charge as requested by the plaintiffs in error, and alleged in their first and second assignments of error.

The next question, and the only one we deem it necessary to consider, is, whether the Company can limit their common law liability by contract. This question involves, under the facts of this case, both the power of limitation by notice and by special agreement; and in this respect it is more broadly put than the facts of the case warrant, as the point thus stated assumes the existence of an express contract, or implies it from the terms of the receipt and accompanying notice. The error assigned is that the court refused to charge that the Company had a right, by contract with the defendants in error, to limit their common law liability; and that if the jury should find that, by *the terms of the receipts* given by the Company to such defendants, it was stipulated between them, &c., such stipulation would define and limit the Company's liability in this case.

We say the question is more broadly stated than the case warrants, because the assumption of the request that "the terms of the receipt" (by which was intended the receipt, and notice limiting the Company's liability endorsed thereon) determine the contract, is not in accordance with the law — all the cases which give to such notice any validity agreeing that something more than mere notice endorsed upon a

receipt, or otherwise brought to the consignor's knowledge, is necessary to relieve the carrier from his common law liability. His assent to the limitation is still necessary; and this is a question of fact for the jury, to be determined by evidence *aliunde*, and is not the subject of presumption from the terms of the receipt alone. And this is the correct rule respecting notices of common carriers, designed to have such effect.

Now, by their charter, this Company were created common carriers; it was made their duty to transport property for all persons indifferently; and this they can not refuse to perform. This duty is, in the absence of any contract, attended with extraordinary responsibilities and liabilities, which constitute them insurers of property while in their possession as carriers, and they can no more restrict these, unless upon the free and full agreement of the party dealing with them, than they can refuse to carry when required.

Such agreement is not to be implied from the posting of notices, or the simple delivery of one to the consignor, as this would be no more than limitation of his liability by the carrier by *ex parte* action. Some evidence of assent to the terms of the notice is necessary, from which a contract may be implied. In such case, if it is sought to be inferred from the acceptance of a receipt specifying a limitation of liability, or referring to an accompanying notice, for such limitation; or if it is sought to be inferred from previous notice and dealings; if it appear that the price of freight was made lower in consideration of such special restriction, and the party has received the benefit of such reduction of freight; such, or similar facts, might, and undoubtedly would, furnish strong evidence of assent; as in *York v. N. M. Railway Co.* 22 *Eng. L. & Eq.* 315, and as in the case of *The Am. Trans. Co. v. Moore*, 5 *Mich.* 368. But, if in a case otherwise similar, no such difference in the price of freight was made, or if the party had paid, or agreed to pay, the higher rate, or the price uniformly demanded according to the tariff

of the Company in all cases, or if no optional tariff of prices, of which the forwarding party may avail himself, is shown to exist, little or no inference of assent to such special terms can be drawn, without allowing the Company, in effect, to limit their liability by a mere notice.

Again, upon grounds of public policy, this right should not exist in the Company. The public has a right to insist upon the full common law liability as carriers, unless a contract, releasing the Company from such liability, be clearly shown.

The immense powers and franchises bestowed upon them are granted in consideration that they shall, among other duties, "transport merchandise and property on their road, without showing partiality or favor, and with all practicable dispatch."— See *Charter*, §15. From the facilities they offer, and are bound to provide, for transportation; and from their rapidity of locomotion, they do, and necessarily must, absorb nearly the entire business of carrying merchandise and property requiring carriage and deposit along and in the vicinity of their route, and competition is virtually destroyed. There is, in a certain sense, a compulsion upon all requiring transportation of property to employ them; and a restriction of liability by notice is measurably compulsory. There is no mutuality or freedom of choice offered. The person desiring goods forwarded is compelled in reality to have them carried forward by the Company; their obligation is to carry them; and a restriction of the liabilities primarily growing out of that obligation, by a notice, is an imposition of terms rather than a contract. We hold, therefore, that if the Company can, in any form, restrict their common law *liability*, they can not restrict it by notice *alone*. And this brings us to the principal question raised,— Can they by contract? We unhesitatingly say that the *Company* can not restrict their common law liability as carriers in any way. But the question involves more than this power of the Company. Whether they can enter into a contract with an individual desiring to

employ them, by which such individual relinquishes some of the rights which the law, in the absence of a contract, gives to him, is quite another question, and involves the power of all who seek to employ them, to contract respecting such employment. It is the unfortunate form in which this question has been presented that has surrounded it with difficulties, or suggested any doubts. The idea prominently conveyed by the question is, that of the *ex parte* action of the Company; and this arises from the form of the question,— Can the Company "restrict," or "limit"? &c.;—which suggests that of individual action. But when a contract is made, there are at least two parties acting, and to hold that the liability of the Company is inflexibly and unalterably fixed by law, denies to parties employing them the right of making any contract with them, upon any consideration by which the liabilities of the Company may be lessened. In other words, the doctrine leads to this result:—The law says to all persons who desire to have property transported by railway companies, you can only peremptorily require to have your property transported—the law affixes the terms; with the Company you have no right of choice or contract as to such terms, however advantageous to you such right may be. Now, the contract of an individual with the Company, made to subserve his interest, is not a restriction by the Company of their common law liability, even though a diminution of such liability results therefrom. All the authorities, with perhaps a single exception (see *The Rome Railway Co. v. Sullivan*, 14 *Ga.* 277) beside that of *The Mich. Central R. R. Co. v. Ward*, concur that such contract can be made; and in these cases the power of the Company to contract for the transportation of property, whereby their common law liability may be lessened, is denied as being against public policy, inconsistent with their charter, and incompatible with their continued existence.

It is said that they are created common carriers; that to

this character the law inflexibly attaches certain duties and liabilities; that these are necessary incidents, and can not be cast off, except by laying down such character, and consequently not without forfeiture of their charter, or, at least, the self-creation of a new character. But is this the correct view to take of this subject? The principle usually suggested as that upon which the right of the carrier to make a contract by which his liability will be limited or restricted, is that stated by Bronson J. in *Hollister v. Nowlan* (19 *Wend.* 247), viz.: That "the person entrusted with the goods, although he usually exercised that employment, does not, in the particular case, act as a common carrier."

The same idea is also thrown out by Mr. Justice Nelson, in *The New Jersey Steam Nav. Co. v. The Merchants' Bank* (16 *How.* 344), where he says: "The owner, by entering into the contract, virtually agrees that, in respect to the particular transaction, the carrier is not to be regarded as in the exercise of his public employment, but as a private person, who incurs no responsibility beyond that of an ordinary bailee for hire, and answerable only for misconduct or neglect." Whether this be the correct principle upon which to base this right, or not, it is very certain that all the cases from the time of Lord Coke down, recognize this right of the carrier to contract respecting his employment, and thereby to diminish his liability. But this right is recognized as a power to contract, not to restrict.

For my own part, I can not appreciate the correctness of the reason, or accede to the principle, upon which this right is based. It has sprung, I think, from the undue prominence given to the idea that the carrier was, by the contract, *restricting* his liability, and in forgetfulness of the fact that such contract is the mutual act of parties in relation to a matter of private business. Now, it is true that the occupation of a carrier is a public employment, in a certain sense; that is, that he undertakes to carry for all persons indifferently for hire: but, in my view, *this* undertaking fixes his char-

acter, irrespective of rates and risks, and he only abandons it by refusing to carry. The duties and liabilities which the law imposes upon him, are only imposed because the public character has been already assumed by him.

They do not go to create it. When that character has been assumed, and so long as it continues, it is the right of every person to require of the carrier the transportation of his property along his route, upon the payment of freight. This can not be refused, although it may be regulated. In the absence of any contract, the law imposes upon the carrier the extraordinary liability of insurer against all loss, unless occasioned by the act of God, or the public enemy; and this becomes the terms of transportation, and may be called the contract of the parties, arising immediately upon the delivery of the property for carriage. But the law only makes a contract for the parties, or imposes a liability, when they have made no contract for themselves. The employer may procure the transportation of his property upon such terms as he may deem most advantageous to himself, if he can procure the carrier's assent to such terms; and, in that event, the carrier is none the less a common carrier, although acting under a special, and not an implied, contract.

In my judgment, he acts as a common carrier so long as he carries for all indifferently, whether under the common law liability, or under a contract with his employer. An inn-keeper is one who keeps a house open for the entertainment of travelers; and the law, in his case (as in that of common carriers), imposes upon him special liabilities in respect to his guest's property. Yet, no one doubts but that such liability may be lessened or restricted by a contract between the landlord and such guest; and if it should be, I apprehend no one would consider the former any the less an inn-keeper. He is still exercising his public employment, and bound by his primary obligation, namely, to entertain all persons applying; and this obligation extends in favor of the traveler who may, by special contract, have released him

from some, or all, of the extraordinary liabilities imposed by the law in his behalf. It is upon the basis of his holding such character that the contract is made.

But whatever my own view of this subject may be (and the Court expresses no opinion upon it) — whether the carrier lays down, in the particular instance, his public character or not — we are all agreed that the law does not compel persons dealing with carriers, to rely and insist upon this liability which it primarily imposes in their favor. In these, as in all other cases, the law recognizes the competency of parties to manage their own affairs, and to make such contracts in respect to them as they may deem to be most advantageous, and when the extent of the risk and responsibility of the carrier, on the one hand, and the rights and liabilities of his employer, on the other, have been ascertained and fixed by the contract of the parties themselves, the law applies the maxim, "*Expressum facit cessare tacitum.*"

It is said that these extraordinary liabilities are imposed by law upon common carriers from considerations of public policy, and that, therefore, they can not be thrown off by any act or contract, and the carriers still continue common carriers. It is true the liabilities are imposed from considerations of public policy; but paramount considerations of public policy secure to every man the right to regulate his own affairs, in his own way, and to make such contracts respecting his property as he may regard to be advantageous, if he violate no law; and it matters very little whether the carrier be denominated "public" or "common," or any thing else, so long as his primary obligation, and that which really characterizes his employment, viz., to carry for all persons indifferently, exists. The carrier is always bound to transport the property entrusted to him under the common law liability, if not waived, or in the absence of any contract; but if the person dealing with him thinks it to be for his interest to make a contract, whereby he agrees to hold the carrier to a less degree of liability, or if he choose to become his own insurer,

and can thereby obtain more advantageous rates of freight, or any other benefit, why may he not be allowed to do so?

What principle of public policy, superior to that which secures to every citizen the right to control his own affairs, is contravened, or what law is violated by him, in making the contract? He renounces the benefit of a liability which the law authorizes him to insist upon; and by this renunciation, which is voluntary, and can never be compulsory, the carrier is relieved from such liability. This is the result of his act and volition, as much as of the carrier; and if we hold that he can not do this, because of the benefit to the carrier accruing from it, we must deny to all who have property to transport, if sent forward by a carrier, the ordinary rights of choice and power to contract which belong to every man in every other instance. Such a doctrine we think to be "an unwarrantable restriction upon trade and commerce, and a most palpable invasion of personal rights." — *Dorr v. The New Jersey Steam Nav. Co.* 1 *Kern.* 493.

These considerations, we think, apply with full force to the case before us; and before we can hold that the charter of this Company has in any way prohibited them from entering into such contracts, we must be satisfied that it was not only the deliberate intention of the Legislature to tie the hands of the Company in this respect, but those also of every person doing business with them. A conclusion so at variance with popular rights is not to be inferred from slight grounds, or doubtful or uncertain provisions, but should be warranted by the clear intent and language of the charter.

By the charter, the Company were created a railroad and transportation company. This constitutes them common carriers; and, in the absence of any contract, affixes to them all the liabilities incident to such character, and invests them with the same rights and powers. Among the latter, as we have already shown, exists the universally recognized one of making contracts respecting the terms and liabilities of transportation. They can not discontinue the business of trans-

portation of property, nor refuse to carry that of every one offering it for transportation, according to their reasonable regulations, nor impose terms limiting or restricting their liability as common carriers.

But while these powers are denied them, it by no means follows that the citizen is denied the right of contracting with them; and if the citizen is not, they are not debarred the right of contracting with him, whether the result be to increase or diminish their liabilities.

Now, if they do contract, are they any the less a transportation company, or carriers for all persons indifferently for hire?

It was suggested on the argument that the power to contract was incompatible with the requirements of the charter, that they should "transport merchandise and property without showing partiality or favor, and with all practicable dispatch." But the offer of terms of transportation dependent on different degrees of risk—the freedom of choice by law remaining with the party contracting with the Company—or the contracting with such party in respect to prices and liability, is not within the clause of the charter. This was designed to secure to all the prompt transportation of property, and at uniform rates, in the absence of any contract, without partiality or favor in the order of its being forwarded. The Legislature could have had nothing further in view. They certainly could not, by such general terms, have intended to diminish the rights of the citizen to contract with the Company, according to the suggestions of interest, respecting the prices and risks of transportation.

But, by designing that property should be transported at uniform rates, they did not necessarily intend that it should be transported at uniform risks. If the Company fix certain uniform rates for all cases when the common law liability attaches to the undertaking, and offer different rates when contracts are made—the option of rates and risks remaining, as it must, in the employer—and making no distinction as to the time, order, or manner of transportation, no partiality or favor is shown, and, the option being given alike to all, the Company is exercising no right not available to every class of common carriers.

It is also urged that the charter is in the nature of a contract between the Company and the public, and that any attempt on the part of the Company to restrict their common law liability is against public policy, and void; and for this reason their power to contract upon this subject is denied. This argument has been already sufficiently answered. That their charter is in the nature of a contract, is, to a certain extent, true; but it is a contract that they shall be transporters of property, as other common carriers are. The extent of this obligation we have already shown. In exercising any of the powers common to all common carriers, no contract with the public is violated; nor is any consideration of public policy contravened by suffering a voluntary contract to be made with them by persons employing them, although it should necessarily follow that they contract also, or it should happen that a common law liability is restricted or surrendered. The liability is for the benefit of the employer, and public policy is subserved by compelling them to remain carriers, and forbidding any restriction of liability otherwise than by contract.

We therefore hold—overruling in this respect, also the case of *Mich. Central R. R. Co. v. Ward*—that although the liability of the Company can not be restricted by notice, it may be by contract.

These considerations render it unnecessary to consider the errors assigned by the defendants in error in the case of *Hale v. this Company.*\* The object of the notice has been defined;

---

\*The defendants in error in this case had also brought error upon the same judgment. Upon delivery of the foregoing opinion, the Court directed the following order to be entered in that case:

"*Lorenzo D. Hale and Others v. The Michigan Central Railroad Company.*

"This cause having been duly heard and submitted; and the judgment of the Circuit Court for the county of Jackson in this case having been already reversed upon the writ of error presented in this court upon the same record judgment and proceedings by the Michigan Central Railroad Company; and such reversal having disposed of this case in favor of the defendants in error: It is therefore, on motion of Lothrop, of counsel for defendants in error, *ordered and adjudged*, that said defendants in error do recover of and from the plaintiffs in error their lawful costs to be taxed, and that they have execution therefor."

6 MICH. — 8.

and whether Hale or Howard was the owner of the wheat is immaterial under our view of the Company's liability.

The judgment must be reversed, and a new trial granted.

The other Justices concurred.

