BACKUS, The, (FRANCONET v.) See Case No. 5,048.

## Case No. 712.

### BACKUS v. The MARENGO.

[6 McLean, 487.][1]

Circuit Court, D. Michigan. June Term, 1855.[2]

SHIPPING—CHARTER-PARTY — CHARACTERISTICS OF BILL OF LADING.

1. A bill of lading is conclusive to establish the articles shipped, unless fraud or mistake be shown.

[See Bradstreet v. Heran, Case No. 1,792. Contra, The Henry, Id. 6,372.]

2. Such an instrument has some of the characteristics of a bill of exchange.

3. Good faith in the agents of commerce is requisite.

[Cited in Robinson v. Memphis & C. R. Co., 9 Fed. 139.]

[On appeal from district court of the United States for the district of Michigan.]

[In admiralty. Libel by Frederick W. Backus against the schooner Marengo on a contract of affreightment. Decree for libellant, (unreported.) Respondents appeal. Affirmed. A prior motion in the appellate court for a continuance was overruled in Backus v. The Marengo, Case No. 713.]

Howard & Gray, for plaintiff.
Mr. Holbrook, for respondents.

This is an appeal in admiralty, from the district court. A libel was filed by the plaintiff on a contract of affreightment of five thousand, seven hundred and ninety and forty-six hundredths bushels of wheat from the ports of Amherstburg and Colchester, in Canada, to Buffalo, for the consideration of two hundred and forty dollars. The bill of lading, signed by the captain of the vessel, specified the above number of bushels, and which being received in good order was safely to be delivered at Buffalo. The wheat received fell short of the quantity specified, at the port of delivery, seven hundred and sixty bushels.

The defence relied on is, that all the wheat received was delivered except about ten bushels, which, being wet, the consignee refused to receive. The libellant on the bill of lading paid for the quantity specified. The two witnesses who kept tally of the wheat received at Malden were sworn, and they agree in the quantity. And the amount of wheat received at Colchester was also sworn to, by the person who kept the tally at that place, and from these two ports the entire cargo was received. In support of the defense the deposition of the mate of the vessel was read, who stated that twelve hundred bushels of wheat were received at Malden, which he tallied; and that no account was taken of the quantity of wheat received at Colchester. He says that he nailed down the hatches and consequently,

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirming an unreported decree of the district court.]

that no wheat could have been taken from the vessel until it arrived at Buffalo. The hatches, he says, were not raised until the vessel went under the elevators at Buffalo, to discharge her cargo. And he swears that all the wheat received was delivered at Buffalo; and he states the vessel could not carry more than five thousand one hundred bushels. H. Rowell, a hand on board, confirms the statements of the mate, except that on another occasion, the vessel being filled to her utmost capacity, carried five thousand three hundred bushels. Several witnesses on board the vessel corroborate, generally the statements of the above witnesses. The person who built the vessel stated that she was overhauled some years since and her capacity considerably enlarged.

It is clearly proved that the wheat delivered at Buffalo was carefully weighed and tallied. As the accounts agreed, kept by the witnesses, who were highly respectable men, there could have been no mistake. The captain swore to the manifest, which contained a statement of the amount received at the two ports. And it is proved that he declared at Malden that he had engaged to transport six thousand bushels of wheat, and he should charge for the transportation of that amount. It is clearly and satisfactorily proved that thirteen hundred and fifty-two bushels were delivered at Malden, instead of twelve hundred, as sworn to by the mate; and it is proved that the vessel instead of being two or three miles from the shore when loaded at the port of Colchester, as sworn to by the mate, was only about one-quarter of a mile from the land.

H. Reynolds, a colored man, who was cook, says. that he was on board the vessel the above trip, and that after she was unloaded at Buffalo she was taken into a canal or slip where witness saw that water, to the depth of about eighteen inches, had been in the hold of the vessel. There was a considerable amount of wheat in the vessel, but it being wet the consignees refused to receive it. This wheat covered the floor of the vessel, about eighteen inches deep. There was some wheat sold after the schooner left the elevator. He heard the mate ask the captain what should be done with the wet wheat. At first he answered that he did not know; but afterwards he told the hands to throw it overboard. The next morning the crew threw a considerable part of the wet wheat overboard. They were engaged, the witness says, two or three hours in throwing the wheat overboard. A Dutchman came on board and offered to buy it, and he paid three dollars for the wet wheat that remained. This sale was sanctioned by the captain and mate. The captain was told that about eighty bushels were sold to the man. The hands were engaged in removing the wheat from seven in the morning to near twelve. The seams of the vessel were open and she leaked badly.

The bill of lading is an instrument of commerce. It possesses some of the qualities of a bill of exchange. It is considered as conclusive evidence of the cargo shipped, and cannot be contradicted unless fraud or mistake be shown. The purchase money was paid on the faith of this instrument, and no fraud or mistake is shown. The witnesses for the defence are so contradicted, in regard to the amount of the wheat shipped and delivered, as to render their testimony unworthy of credit. It is extraordinary that the mate and the hands on board should swear that all the wheat received into the vessel was delivered at Buffalo, when they were engaged for several hours in throwing the wet wheat overboard, and in selling some eighty bushels that remained. These facts were within the knowledge of the defendant's witnesses, while they swore that all the wheat received, was delivered.

The quantity of wheat shipped at Malden and also at Colchester is so clearly proved as to remove all doubt on the subject. And the deficiency is accounted for by the leakage of the vessel, the refusal of the consignees to receive the wet wheat, and the subsequent disposition of it.

In all commercial transactions the strictest morality and truth should be observed. If these shall be disregarded, commerce will become a curse instead of a blessing. The richness of its products will be more than counterbalanced by the evils it will disseminate. Especially, when the sacredness of oaths shall be violated by the agents of commerce, it will destroy the confidence of high and honorable men, which is essential to commercial prosperity. The decree of the district court is affirmed with costs.