STRONG *v.* THE GRAND TRUNK R. R. CO.

---

## H. N. Strong v. The Grand Trunk R. R. Co.

*Common Carrier: When intermediate consignee liable for deduction of freight.* In an action by a carrier against an intermediate consignee for a deduction of freight, by virtue of an alleged custom permitting shortage to be deducted when it did not arise from the fault of the prior carrier: *Held,* that the action was properly brought, if the deduction was made under protest, and the carrier had not accounted with the owner of the cargo when suit was commenced.

*Mercantile custom, when void.* A custom that an intermediate carrier who received property subject to charges may deduct from the freight earned by a prior carrier the value of any deficiency between the quantity delivered and that stated in the bill of lading, and that the prior carrier shall not be allowed to show that an error occurred in stating the amount in the bill of lading, is not such a valid custom as the courts will enforce.

*Heard October 24th,* 1866. *Decided January 14th.*

Case made for review from Wayne Circuit.

This was an action of assumpsit, brought by the plaintiff as owner of the schooner Swallow, to recover a balance of freight due upon a cargo of corn carried in plaintiff's vessel from Chicago to Sarnia, and delivered to defendants as intermediate consignees. The object of the suit was to test the right of an intermediate consignee to deduct shortage, when it does not arise from the fault of the prior carrier.

The declaration consisted of three special counts, averring in as many different forms, an indebtedness of the defendants for freight, due upon the transportation of a certain cargo of corn, in plaintiff's schooner Swallow, from Chicago to Sarnia, and the delivery thereof to the defendants at that place. To these were added the common counts.

The plea was the general issue, with notice of special matter.

The facts are stated in the opinion.

The case was tried without a jury, and judgment was rendered for the defendants.

*H. B. Brown*, for plaintiff.

1. This action is properly brought against the defendants as intermediate consignees.

The vessel undoubtedly had a lien upon the cargo for freight, but the defendants also had a right to an examination of its condition and quantity before payment could be required. — 3 *Kent's Com.* 214; 1 *Ab. Adm.* 209; 21 *How.* 527; 1 *Bosw.* 177.

By the custom of the lake ports this could only be done by delivering the cargo into defendant's elevator, where it was mixed with other grain of the same kind and quality and its identity lost. The defendants took the cargo with notice in the bill of lading that the master would look to them for freight, and in so taking it and depriving the vessel of its lien became obligated to pay. — 1 *Pars. Mar. Law*, 220, 221; 1 *Iredell*, 236.

This rule that any party receiving goods under a bill of lading conditioned upon payment of freight is liable therefor, is well stated in *Canfield v. Northern R. R. Co.* 18 *Barb.* 586, the leading case upon this point; and see 24 *N. Y.* 317.

It is also shown and admitted to be the custom for carriers receiving cargoes from other carriers to pay all

back charges and to retain their lien for them at the place of destination. This custom has been expressly recognized by the courts. — 37 *Barb.* 236; 8 *Gray*, 266; 6 *Allen*, 246; *Hill and Denio*, 163; 1 *M. and S.* 157; 5 *M. and W.* 502.

This may now be considered the settled law of the land.  •

2. As between the owner and consignee of the cargo (or his agent) and the vessel, the bill of lading may be explained by showing a mistake in the amount or condition of the cargo.

A bill of lading is both a receipt and a contract; so far as it is a contract, it can not be explained; so far as it is a receipt, it follows the ordinary rules relative to such instruments and may be shown to have been signed ignorantly or through mistake. — *Abbott on Shipping*, 324; 1 *Pars. on Mar. Law*, 137; *See* 1 *Moody and Ry.* 106; 7 *A. and E.* 29; 3 *Saund.* 7, 399; 12 12 *Barb.* 99; 1 *Abbot Adm.* 115, 188, 212, 397; 5 *Seld.* 529; 16 *Ill.* 408.

In the present case there can be no doubt as to the cause of the deficiency. The measurement in defendants' elevator is admitted to have been correct; it is also shown that the vessel put to sea with her hatches battened down, and that no loss or damage occurred upon the voyage. Hence there must have been a mistake in the measurement at Chicago — probably an error of one tally, as the corn was weighed in hoppers of 200 bushels — nearly the amount of the shortage.

3. Defendants had no authority to deduct the value of the shortage in this case.

*a.* They would not have had this authority even if the cargo had suffered loss by an act for which the vessel was responsible.

The claim of defendants is in the nature of a set-off or recoupment, and might be made the foundation of a

separate action. Indeed, at common law, and in England, the rule is well settled that the shipper can not, in an action brought against him for freight, set up in defense that the goods were damaged by the negligence of the carrier, but is obliged to resort to a cross action.— 1 *Pars. Mar. Law, p.* 172, *note* 2, *and cases cited.*

Hence, the defendants can have no greater rights than they would have had if they had paid the entire freight and brought an action against the carrier. Now, the general rule is perfectly well established that actions against carriers for loss or damage must be brought in the name of the person whose legal right has been affected. — *Angell on Carriers,* § 491; 1 *Pars. on Mar. Law,* 212–219.

In general the owner is the only proper party to sue, and the only case in which a mere carrier can bring suit concerning the goods is where damage is done them while in his possession — an action arising solely from his possessory interest. — *Angell on Carriers,* § 348; *Story on Bailm.* § 93–95.

Cases of this kind usually relate to the question as to whether the consignor or consignee is the proper party to sue, and it has been repeatedly held that neither of them, as such, is entitled to bring the action; *Angell on Carriers,* § 495; 15 *Wend.* 474; 4 *Blackf. (Ind.)* 364. And it usually turns upon the question as to which has the right of property in the goods. — 1 *Ld. Ray.* 271; 3 *B. and Ad.* 283.

In the present case the defendants had not the slightest interest in the cargo until it came into their possession. Their adjustment of shortage would not be binding upon the owner unless subsequently ratified by him (*Travis v. Thompson,* 37 *Barb.* 236,) nor would payment of the deficit to defendants exonerate the vessel from liability, unless the owners had actually received the amount from them.

*b.* But conceding for the sake of the argument that an intermediate consignee is authorized to deduct shortage where it is occasioned by the admitted fault of the the vessel, no case holds that an intermediate consignee is authorized to deduct shortage where it arises from a cause for which the carrier is not responsible.

The books are full of cases holding that when the consignee is sued for freight and sets off damage or deficiency of the cargo, the plaintiff may show a mistake in the bill of lading. — 33 *Barb.* 532; 28 *N. Y.* 590; 3 *Allen,* 103; *Abbott's Adm.* 115, 212; 1 *A. and E.* 29; 3 *Sandf.* 7, 399; 12 *Barb.* 99, 112; 5 *Seld.* 529; 16 *Ill.* 408; 7 *Mass.* 297; 1 *Cal.* 417; 34 *Me.* 554; 4 *Ohio,* 334; 5 *Ala.* 430; 8 *Gray,* 287; 7 *Allen,* 456.

This case is peculiarly strong in that the Bank of Montreal is both the consignor and consignee of the cargo, and as against them there is no question but that we should have the right of explaining the mistake.

4. The only defense to this action is based upon an alleged custom for common carriers in receiving grain from other carriers to deduct the value of the shortage as shown by their own measurement, regardless of the fact whether the same originated from the default of the carrier.

*a.* Evidence of this should be rejected because the custom is wholly unreasonable. It puts the owners and masters of vessels completely at the mercy of railroads and elevators by depriving them of their lien upon the cargo, and without giving them an opportunity to defend themselves, or even explain the deficiency; extorting such shortage as they may choose to demand, regardless of the master's protest and the fact that the vessel is in no wise at fault. "A custom which is contrary to the public good or prejudicial to the many, and beneficial only to some particular person, is repugnant to the law of reason."— *Broom's Legal Maxims,* 826.

*b.* The custom has not been acquiesced in, but has been the subject of constant dispute.

The multitude of cases cited in this brief also show it to have been a constant subject of litigation. The truth seems to be that vessels are willing to pay one-tenth of one per cent. for unavoidable wastage, or when the shortage is their own fault; and that peaceable men will generally submit to extortion rather than a law suit.

In fine we contend that the established principles of law should not be set aside, and we be compelled to submit· to this forced deduction without some guaranty: that the measurement of the receiving carrier and the price charged per bushel is correct : that defendants' adjustment will be ratified by the owner: and that in a suit against him this adjustment will be recognized by the courts.

And we certainly should not be held responsible where the vessel clearly exonerates herself from fault.

*Maynard, Meddaugh* and *Swift,* for defendants.

1. The defendants claim that there has existed for many years, among carriers of grain shipped in bulk, a custom, whereby one receiving grain from another, deducts from the freight, to which the latter is entitled, the shortage, if any there be, to be determined by comparing the quantity actually delivered with the quantity specified in the bill of lading.

That the custom is proved will not be denied. But it is claimed to be void because it is unreasonable.

2. When goods are transported by a single carrier, there is no doubt of the right of the consignee to deduct from the freight the value of any portion of the goods which may have been lost in their transportation.— 3 *Mich.* 281.

But when goods are transported over a long route, by several successive carriers, and each carrier who receives the goods pays all the back charges,—whether the consignee shall have the right to deduct from the whole amount of freight, damages which he has sustained by reason of a loss during the transportation, is a different question.

If the loss occurred solely through the fault of the last carrier, the right of recoupment would undoubtedly still remain. But if he was guilty of no fault, and the loss occurred through the neglect or misfeasance of some previous carrier, the right to recoup damages will depend upon circumstances.

As against any carrier, through whose fault an injury has happened to the goods, the consignee has a right to recoupment.

And when a carrier receives goods from a previous carrier, on the same route, through whose gross carelessness or willful misfeasance, it is admitted or is clear that a loss has occurred, it would be paying a premium for neglect of duty· to allow the former to pay full freight, and then recover the same sum of the consignee. In such a case there would seem to be no doubt that the carrier receiving the goods ought to adjust the loss with the previous carrier, or that the consignee would have a right of recoupment.— 24 *N. Y.* 317; 6 *Gray*, 539.

But when the goods received by the second carrier, though they have, in fact, been damaged in the transportation, are in apparent good order, and he, in good faith, pays full freight, without any deduction, it may be right that he should recover of the consignee the sum thus paid. To adopt any different rule would compel each carrier to open packages and make a minute examination of each item, and thus cause great delay and expense, and subject the goods to the risk of additional njury in· the handling and examining them.

But in this class of cases he must see that the goods are in apparent good order, as described in the previous bill of lading, or if not, use reasonable exertions to ascertain how they became damaged, and the party liable therefor.—16 *Ill.* 408.

3. In a case like the present, where, upon comparing the actual quantity delivered, with the quantity specified in the bill of lading, there is an apparent deficiency, this custom comes in and puts an end to the difficulty. It makes the bill of lading conclusive upon the carrier who first receives the goods, and requires him, in case of mistake, to look to the party from whom he received them. It does no injustice to him. For he might have protected himself, either by requiring payment of freight in advance, or by making sure that the quantity of goods delivered to him corresponded with the quantity mentioned in the bill of lading, or by insisting upon an agreement that, for any discrepancy in quantity between the goods, as measured anywhere on the route, and as stated in the bill of lading, he should settle with the consignee alone. Such a custom fixes an invariable rule; compels the persons to whom it properly belongs to adjust any loss; prevents disputes among successive carriers; relieves the carrier who receives the goods from all embarrassment, and expedites the carriage of the goods.

A custom, justified by so many reasons and adopted by the practical wisdom of experienced men to meet the necessities of their business, and so long maintained, is surely a reasonable one.

4. But though the custom is not a valid one as to all persons, the rights of those who have acted upon it are to be governed by it. So far as the plaintiff is concerned, the presumption, from his having been so long engaged in the business of carrying grain, together with other circumstances, is that he knew it.

5. But, assuming that we mistake the facts, and that the master denied the right to make any deduction for shortage, on what grounds are the defendants liable for the balance of freight due the plaintiff? If the corn had belonged to them, or been carried for their benefit or at their request, there might be some ground for implying an agreement to pay for such freight. But they were under no more obligation to pay it than any other person, unless, upon receiving the goods, they, either expressly or by implication, promised to pay for it. So far from that, they expressly refused to pay any more than they did pay, and the plaintiff, by his agent, received the sum they offered. If the mutual assent of the parties is essential to a contract, then here was no contract. In order to maintain this action, the plaintiff should show — what he had failed to do — that the master informed the defendants he should still hold them liable for the balance of the freight, and gave them an opportunity to return the corn. By consenting to their keeping the corn, and receiving the money, he waived all right to any further claim upon the defendants.— 24 *N. Y.* 317.

Cooley J.

This case presents questions regarding the proof and validity of a mercantile custom, by which an intermediate consignee is authorized to deduct from the back freight earned, any deficiency in the cargo, as shown by a comparison of the bill of lading with the measurement of the carrier receiving it.

It appears that the plaintiff's vessel, the schooner Swallow, took on board a quantity of corn at Chicago, consigned to the Bank of Montreal, Coburg, and stated in the bill of lading to be 20,034$\frac{26}{56}$ bushels. This was the measurement of the elevator at Chicago, and was supposed at the time to be correct. On the delivery of the cargo to the defendants as intermediate consignees, at Sarnia, a deficiency of 205$\frac{44}{56}$

bushels was discovered, and the defendants, thereupon, refused to pay the freight upon the amount actually delivered, except subject to a deduction of the value of this deficiency; justifying their refusal upon the custom mentioned. The evidence of the master of the vessel, if trustworthy, would show very clearly that the apparent deficiency was in consequence of erroneous measurement at Chicago; and as the supposed custom makes no exception of the case where the master is not in fault, we must consider its validity on the assumption that the facts are as claimed by the plaintiff.

It may be well to see at the outset what the rights of the parties would be in the absence of any such custom, and what the changes are which it proposes to make in the law.

There can be no doubt that although the bill of lading specifies the amount received, it is, notwithstanding, like other receipts, open to explanation, and the carrier is at liberty to show that the actual amount which came to his hands is different from that stated: *Wolfe v. Myers*, 3 *Sandf. S. C.* 7; *Ward v. Whitney, Id.* 399; *Dickerson v. Seelye*, 12 *Barb.* 99; *Backus v. Schooner Marengo*, 6 *McLean*, 487; *Blanchard v. Page*, 8 *Gray*, 287. And see *Ellis v. Willard*, 9 *N. Y.* 529. The qualification of this rule is where third persons have acquired rights by purchase or advance of money, based upon the statement contained in the bill of lading, and relying upon its accuracy: the extent of which qualification, and when and against whom applicable, it does not become important to discuss here, inasmuch as it is not claimed that any such rights have intervened.

Although the consignee of property is authorized to recoup from the freight earned any losses properly chargeable to the carrier, it is well settled, and indeed follows logically from the rule before stated, that he is not entitled to deduct as deficiencies any difference between the

amount delivered to him, and that receipted by the bill of lading, where the carrier can show an error in the bill, and that he actually delivered all that he received. *Bissell v. Price*, 16 *Ill.* 408; *Ryder v. Hall*, 7 *Allen*, 456; *Meyer v. Peck*, 33 *Barb.* 532; *S. C.* 28 *N. Y.* 590; *Sears v. Wingate*, 3 *Allen*, 103. See for the same principle *Bowman v. Hilton*, 11 *Ohio*, 303; *Lee v. Salter*, *Lalor*, 163. That the carrier has a lien upon the cargo for the freight earned is not disputed; 3 *Kent*, 214; *Chitty on Carriers*, 220; *Pars. Merc. L.* 212; and an intermediate consignee by whom the property is received subject to the charges, is liable to an action therefor in case of neglect or refusal to make payment.—*Abbott on Shipping*, 421; *Canfield v. Northern R. R. Co.* 18 *Barb.* 586.

The custom alleged, if valid, changes the .settled law in several important particulars. *Firstly:* It precludes the carrier, as between himself and the intermediate consignee, from explaining the bill of lading and showing any error that may have occurred in stating the quantity; and this without regard to the question of intervening equities. *Secondly:* It gives to the intermediate consignee the right not only to deduct the deficiencies chargeable to the carrier, but also all such discrepancies between the bill of lading and the actual amount delivered by the latter, as have resulted from erroneous measure or count, and consequently are not deficiencies in any proper or legal sense, and could not, in a suit between the carrier and the ultimate consignee, be recouped at all. *Thirdly:* As to any amount thus deducted, and not properly chargeable to the carrier, he is deprived of his lien upon the cargo, and if he has any remedy for it, he is obliged to resort to the personal responsibility of the party liable to him, in lieu of the security which he took into his own hands when the cargo was received. Meantime the value of the supposed deficiency is paid over to the ultimate consignee, who

has no claim to it whatever if, in fact, he receives all that was consigned to him.

Before proceeding to discuss the custom upon principle, we shall examine the cases cited upon the argument, and which are supposed to have some bearing upon the question of its validity. There are several cases where it has been held to be the duty of an intermediate carrier to protect the interests of the consignee in the property carried, and where certain powers for the adjustment of damages actually sustained have been recognized as vested in him. In *Bissell v. Price*, 16 *Ill.* 414, it is said that, "While the warehouseman or carrier is authorized to advance for, and on account of the consignee, previous charges upon the goods, he is bound to act in good faith towards, and to carefully watch the interests of the owner, whoever he may be. He is bound to do this to the same extent that a prudent man would were he present, and acting for himself. He must see that the goods are in apparent good order, as described in the previous bill of lading, or, if not, use reasonable exertions to ascertain how they became damaged, and the party liable therefor. So, also, to the same extent he must see that the previous charges are reasonable before he is authorized to pay them."

There is nothing in this indicating that an intermediate carrier is or may be vested with greater powers than those possessed by the owner himself; or that the prior carrier, in dealing with him, can be subjected to demands against which he would have a complete defense as between himself and the ultimate consignee. On the contrary the court hold the intermediate carrier to be vested, as respects the property carried, only with certain powers of the owner, and bound on his behalf to exercise them with diligence and good faith.

The facts in *The Fitchburg and Worcester R. R. Co. v. Hanna*, 6 *Gray*, 539, were, that several carriers, whose operations constituted one continuous line of transportation

15 Mich.—P.

from Fitchburg to New York, and who, by mutual agree-
ment divided between them, in certain specified propor-
tions, the freight earned upon the whole route, had carried
property for the defendant, and in a suit brought by one of
them to recover the charges, the defendant sought to re-
coup damages to the property, occurring somewhere on the
route, but not shown to have occurred upon that portion
over which the operations of the plaintiff extended.    The
court held the recoupment allowable, but at the same time
said :·  "If this service had been performed, and no special
agreement had been made in relation to the terms upon
which it should be done, each of the several parties who
contributed towards it would have been entitled to a rea-
sonable compensation, in proportion to the service which
they respectively rendered, and would have been liable only
for such failures and delinquencies as occurred on their own
portions of the line."  It is obvious that the facts as stated
have no analogy to those now before us, while the general
rule stated by the court, in the absence of any joint under-
taking, is the one which the defendants in this case seek
to avoid by proof of the custom.

The case of *Davis v. Pattison,* 24 *N. Y.* 317, which was
supposed on the argument to be most directly in point,
does not seem to us, on careful examination, to be even .
analogous.    It appears that one Davis received at Oswego
three thousand seven hundred bushels of wheat to be car-
ried by canal and delivered to the defendant as intermediate
consignee at Troy.    He delivered all but thirty bushels,
which he either converted to his own use, or lost.    The
defendant offered to pay the freight if Davis would deduct
the value of this deficiency; but he refused to do so, and
action was brought to recover the whole amount.    The
court held that the defendant had a right to make
the deduction.    Now it is quite evident that that case
differs from the present in all its legal bearings.    It
was not claimed there that any custom had changed the

law of carriers applicable to the case, but the defense was rested upon general principles. It does not appear from the report that Davis disputed the deficiency being properly chargeable to him, and it was, therefore, clearly a case where the deduction could have been made, by way of recoupment, had the action been brought against the owner himself. And it was not held or intimated in that case that the carrier was liable to have deduction made for deficiencies for which, as carrier, he was not insurer against, or that the intermediate carrier had greater privileges in respect to deductions than were possessed by the owner. On the contrary, the whole reasoning of the case shows that the court considered the intermediate consignee as standing, in respect to the suit, in the place of the owner; bound to protect his interest, and entitled to all his defenses, but no more. In short, this case decides that a carrier suing to recover freight may collect the amount earned by him, less any loss occurring to the property while in his hands and properly chargeable to him as carrier; and the question whether, by custom, he might be charged with other losses, or with supposed deficiencies, not existing in fact, was not before the court, and there was no expression of opinion upon it.

The case of *Canfield v. The Northern R. R. Co.* 18 *Barb.* 586, is more nearly like the present in its facts than any other which has been reported, and it was there held that the intermediate carrier had no right to deduct from the freight earned, the amount of a discrepancy between the bill of lading and the amount delivered to him, where it was shown that the discrepancy occurred by mistake in stating the amount in the bill of lading. But as the defense there was not rested on evidence of usage, the case can not be considered an authority on the point now involved, and we have been unable to find any other that bears very directly upon it. We must, therefore, consider the custom in question

upon general principles, and see whether it is capable of being sustained by them.

There are many customs which, to a certain extent, are convenient, but to which the law does not allow a compulsory force, either because they have never been generally acquiesced in, or because, to give them general application, would in some cases violate fundamental principles and rights. The law has established certain rules which are to test the legal validity of a custom; and we shall now examine the one alleged, in the light of the standard thus afforded.

1. Before any custom can be admitted into the law, it must appear that the usage has been general and uniform, the custom peaceably acquiesced in, and not subject to contention and dispute. — *Broom's Legal Maxims,* (5 *Am. Ed.*) 828 ; see *Oelrichs v. Ford,* 23 *How.* 49. It is not very clear that the evidence in this case establishes any such custom. The testimony of witnesses shows that the question of shortage is frequently the subject of dispute. Capt. .Elsie says : " The custom is sometimes acquiesced in by the captains of vessels, and sometimes disputed. If the shortage is small, they generally pay it ; if it is large, they generally dispute it, and leave it to be settled by the owners." Mr. Stephenson, the general freight agent of the defendants, says : " I have known captains refuse to pay the shortage, but we always have the freight in our own hands before we settle. We invariably refuse to pay the captains until the two principals are agreed." Capt. Montgomery, after testifying that the custom is universal, says : " I have known the question of shortage disputed at least a hundred times." Several other witnesses give evidence that the custom is general, but the impression which the whole evidence leaves upon our minds is, that the deduction of shortage is submitted to when the carrier concedes that it is his fault, or where the amount

is not beyond what is usual and incident to transportation; but that it is disputed in other cases. A custom varying the common law must be clearly proved; but we do not find clear evidence in this case that ship owners concede their liability to have deductions made from freight earned, for the value of property receipted for by mistake. That the railway companies assert the right, is fully shewn; but it must be generally assented to, as well as asserted, before the custom can be established.

2. Another essential to a good custom is, that it be *certain.* The evidence of usage in this case does not inform us whether, under it, the carrier is to have any remedy for the freight deducted, and if he is, whether that remedy is left to common law rules, or is provided for by the custom itself. We will not assume that the carrier is to be deprived of all remedy, for that would be so manifestly unjust and unreasonable that it could not be seriously urged that the law should sanction it. And if he has any remedy, it must be either, 1. Against the consignor; or, 2. Against the intermediate consignee; or, 3. Against the owner or ultimate consignee. And it may be well to examine the grounds upon which either of the three may be held liable, as well as the reasonableness of remitting the carrier to a remedy against one, rather than the others.

If the *consignor* was not himself the owner of the property, and had made no express contract with the carrier either for the payment of freight, or for the delivery of any specific quantity, and that which was delivered was, by the bill of lading, deliverable to the consignee on payment of charges, the consignor could not be liable over to the carrier in a case like the present, except by the application of some rule unknown to the common law. — *Pars. Merc. L.* 352 *and note; Chitty on Carriers,* 208; *Barker v. Havens,* 17 *Johns.* 234; *Drew*

*v. Bird, M. and M.* 156. It might perhaps be suggested that the consignor, having undertaken to ship a certain quantity to the consignee, any payment to the latter for deficiencies may be recovered for, as a payment made to the use of the former; but any . liability upon this theory must fall to the ground, if, in fact, the consignor was under no contract obligation to forward a specific quantity to the consignee, or if, being under such obligation, he would still be in time under his contract to forward the balance afterwards. And while the consignor is still entitled to fulfill his contract, by delivery of the grain instead of paying its value, we do not perceive how any third party can be authorized, in correcting an error in part performance, to compel the consignee, who is entitled to grain, to accept, instead, its price at a distant point. Such a case would require ratification by both the consignor and the consignee before the former could be made liable to the carrier; and in the absence of ratification, the latter must seek his remedy elsewhere.

That the *consignee* or owner would be liable, where the amount deducted from the freight by the intermediate carrier had been forwarded to and received. by him, there can be no doubt. If he receives all the property shipped to him, a sum of money paid in addition, for a supposed deficiency not existing in fact, is paid without any consideration, and he can have no claim to retain it. But if this alleged custom is legal and compulsory, and the carrier is remitted to the owner of the property for his remedy, we shall have here, perhaps, the first instance in the law where a person is required, by legal compulsion, to make a payment, or submit to an exaction, and then empowered immediately to sue and recover it back from the very person to whose use he has paid it.

But while the owner would be liable, in *such a case, after the money has been paid to him, it is equally clear

that, at the common law, the intermediate consignee would also be liable, at least until he had paid over the money, or in some manner changed his legal position relative to the owner, with respect to the money, after making the deduction. His position would be that of an agent to whom money had been paid for a principal not entitled to it; and that an action is maintainable against 'the agent under such circumstances is well settled. — *Parker v. Bristol & Exeter Railway,* 7 *E. L. & E.* 528; *Snowden v. Davis,* 1 *Taunt.* 359; *Edwards v. Hodding,* 5 *Id.* 815; *Hearsey v. Pruyn,* 7 *Johns.* 179; *La Farge v. Kneeland,* 7 *Cow.* 456; 1 *Pars. on Cont.* 79; *Smith's Mer. L. B.* 1, *C.* 5, § 7. And treating this custom as perfectly valid, we do not see why this action is not properly brought against these defendants, if the deduction was made under protest, and they had not accounted with the owner of the corn when suit was commenced. Customs of this description are to be strictly construed, and we are not to assume that they change the common law beyond what expressly appears. — *Broom's Legal Maxims,* 5 *Am. Ed.* 829. Assuming that defendants had the right to make the deduction at the outset, but that this does not deprive the plaintiff of all remedy, we have only to see against whom the common law would give that remedy; and we can not doubt that these defendants would be liable, either as consignees who had received property subject to charges, or as agents who had exacted money for a principal who has no right to retain it. The anomaly of allowing them to make the deduction, and then have it recovered back from them, is no greater than to allow a similar recovery from the ultimate consignee on whose behalf the deduction is made.

But we do not propose to place our judgment upon this ground exclusively, as we are clearly satisfied the custom itself can not be enforced in the law.

3. All customs must be *reasonable.* If the one in question were confined to vesting in the intermediate consignee

the same power to refuse to pay freight in cases in which the owner would be justified in doing so, it would not exceed the reasonable province of a mercantile usage. But it goes very much further when it makes the bill of lading conclusive in favor of the intermediate carrier, and allows him to make deductions for supposed deficiencies, not in fact existing, which the owner himself would not be permitted to make. And it is specially unreasonable if it deprives the carrier of his lien, and remits him to a personal responsibility which he never relied upon, whether he is given a remedy in all cases against the consignor, or required to follow the money to the hands of the owner, who will usually reside at a point distant from the place where the exaction was made, and frequently in a foreign country. That such a custom may be convenient, and operate justly in most cases, is very true, but it can only rest for its observance on the consent of parties.

The courts are frequently required to hold a custom unreasonable and void, notwithstanding strong reasons urged in favor of it, as a rule of convenience, by the class by whom it has been adopted, and where the hardships in any case would not be greater than in this. The case of *Leuckhart v. Cooper*, 3 *Bing. N. C.* 99, is an illustration of such cases. The usage given in evidence there was, for public warehousemen in London to have a general lien on all goods from time to time housed with them for and in the name of the merchants or other persons by whom they were employed, for all moneys or balances due from such merchants or persons for expenses incurred about goods consigned from abroad, and irrespective of the ownership of the goods upon which the lien was claimed. In *Bryant v. Commonwealth Ins. Co.* 6 *Pick.* 131, a custom for the master of a vessel stranded, to sell the cargo without necessity, was held void. In *Bowen v. Stoddard*, 10 *Met.* 380, a custom among merchants of New Bedford and Fairhaven, engaged in the whaling trade, to accept the bills

of their masters, drawn for supplies furnished abroad, failed to receive the sanction of the court, on the ground that a usage could not be reasonable which put at hazard the property of the owner at the pleasure of the master. And see *Jordan v. Meredith*, 3 *Yates*, 318; and *Spear v. Newell*, referred to in 23 *Vt.* 159. Some of the cases cited were more liable to work injustice generally, than the present; but as a custom, if good at all, is compulsory on all cases falling within it (1 *Bl. Com.* 78), we are not at liberty to regard it exclusively in the light of its effects in the majority of cases. Special customs are so liable to create confusion of legal rules in directions not contemplated in their adoption, that they are admitted into the law with great reluctance; and it is not often a hardship to parties to reject a custom, so long as they are left free to make their own bargains, and can incorporate it in their contracts if they see fit to do so.

We have not deemed it necessary to consider how far, if the custom were certain and valid, an adjustment between the two carriers for an actual loss or conversion could be binding on the owner in the absence of ratification by him; or how far a similar adjustment for a supposed deficiency which did not exist at all, could bind either the consignor or the consignee. It is sufficient that there are in the usage elements which prevent its being accepted in the law as a compulsory custom. We think the circuit judge erred in holding it valid, and the judgment must be reversed, and judgment entered for the plaintiff in this court for the amount claimed, with interest.

The other Justices concurred.