## The Michigan Central Railroad Co. v. Henry H. Lantz and another.

*Michigan Central Railroad: Charter construed: Goods awaiting delivery: Warehousemen.* The Michigan Central Railroad Company, under its charter, is liable as warehouseman only, and not as common carrier, for goods transported over its line to Detroit and there deposited in its warehouse awaiting delivery to an intermediate consignee; this was ruled by *6 Mich., 243.*

*Construction of charter: Goods awaiting delivery.* In construing the charter in this regard, sections eleven, twelve, fifteen and sixteen must be considered and construed together, and so considered, it is clear no distinction was intended to be made between goods awaiting delivery to a final consignee and those awaiting delivery to an intermediate consignee.

*Heard October 12 and 13.    Decided October 26.*

Error to Kalamazoo Circuit.

*Edwards & Sherwood* and *G. V. N. Lothrop,* for plaintiff in error.

*Severens, Boudeman & Turner,* for defendants in error.

MARSTON, J:

The only question of any importance in this case is, whether the railroad company, under its charter, is responsible as common carrier or warehouseman for goods transported to Detroit and there deposited in its warehouse, awaiting delivery to an intermediate consignee, and afterwards destroyed by fire while so deposited.

Although it was held in *Michigan Central Railroad Co. v. Hale, 6 Mich., 243,* that under such circumstances the company was responsible only as warehousemen, there now seems to be a misapprehension in the minds of some persons as to what was decided in that case, owing to recent decisions in New York and the supreme court of the United States.

The decision in this case depends entirely upon the con-

struction of sections eleven, twelve, fifteen and sixteen of the company's charter.

Section eleven authorizes the company "to charge for tolls and transportation such sums as shall be lawfully established by the by-laws of said company;" and by section twelve "the said company shall have full power and authority to demand and recover and take the tolls or dues to and for their own proper use and benefit on all goods, merchandize and passengers using or occupying the said railroad, or any other convenience, erection, or improvement built, occupied or owned by the said company, to be used therewith, and shall have power to regulate the time and manner in which goods and passengers shall be transported, taken and carried on the same, as well as the manner of collecting all tolls and dues on account of transportation and carriage and storage, and shall have full power to erect and maintain such toll-houses and other buildings for the accommodation and proper transaction of their business as to them may seem necessary."

That portion of section fifteen bearing upon this question reads as follows: "It shall and may be lawful for the said company from time to time to fix, regulate and receive the tolls and charges taken for the transportation of property and persons on said railroad, as aforesaid, and for storage of property remaining in the depots of said company, if not taken away as hereinafter provided." And the sixteenth section provides that "the said company may charge and collect a reasonable sum for storage upon all property which shall have been transported by them upon delivery thereof at any of their depots, and which shall have remained in any of their depots more than four days," except the Detroit depot, where storage may be charged after the expiration of twenty-four hours upon goods not taken away. "Provided that in all cases the said company shall be responsible for goods in deposit in any of their depots awaiting delivery, as warehousemen, and not as common carriers."—*Sess. Laws of 1846, pp. 51–53.*

Now although it is this last proviso which exempts the company from liability as common carriers, yet in order to ascertain the true intent and meaning of this particular provision it becomes necessary to examine sections eleven, twelve, fifteen and sixteen as above quoted. It is insisted that the whole of section sixteen "clearly refers to cases where the goods have arrived at their final destination and are awaiting delivery to the owner or consignee, and does not apply where such goods are awaiting transportation" by another carrier. Sections eleven, twelve and fifteen give the company authority to fix, regulate and receive tolls and charges for the transportation of property over its road. There is and can be no doubt, but that the authority thus given includes the right to fix, regulate and receive tolls for transporting property, which, upon arrival at the end of the company's line of road, is to be delivered over to some other carrier for farther transportation. If this is not the case, then the company is placed in the strange position of being compelled as a common carrier, to transport property consigned to some person in another state or country, and deliver the same over to the next carrier, without having any power whatever given it by its charter, to fix or receive tolls or charges for the transportation of such property, as the only authority given the company upon this subject is in the language quoted.

The legislature also, in the same sections and in the same connection, gave the company full power and authority to demand, recover and take tolls or dues on all goods and merchandise using or occupying the said railroad or any other convenience, erection or improvement built, occupied or owned by the company, and gave it power to regulate the time and manner of collecting all tolls and dues on account of transportation, carriage and storage, with full power to erect and maintain such toll-houses and other buildings for the accommodation and proper transaction of their business as to them might seem necessary, and with authority to fix, regulate and receive charges for storage of

property remaining in their depots if not taken away as therein provided.—*Sections 12 and 15.*   And again in *section 16* the company is given power to charge and collect a reasonable sum for storage upon all property transported by them, upon delivery thereof at any of their depots, and which shall remain therein longer than the time therein specified.

These different provisions all have reference to the same subject matter, and must therefore be considered and construed together.   When so considered and examined, we fail to discover the slightest ground for saying, that any distinction whatever was made or intended by the legislature between property, whether awaiting delivery to an intermediate or to a final consignee.   The clear and evident intention was, to authorize the company to fix and collect tolls and charges for the transportation and storage of both classes of property, and to place them in all respects upon the same footing. Let us, however, pursue the inquiry still further, and see what the result of a different construction would be.

As a common carrier it is the duty of the company to receive and carry all property offered it for transportation. It cannot refuse to receive and carry property simply because the same may be consigned to parties which would necessitate a delivery to another carrier in order that the property might be taken to its final destination.   The company, having received and carried such property over its line, must take proper care of it until such times as the next carrier may be ready and willing to receive it.   It is very evident that the company must, under such circumstances, very frequently have to store property so carried and awaiting delivery to the next carrier, the same as it does property awaiting delivery to the ultimate consignee.   Is there any good reason, then, why the company should not be permitted to charge and collect storage on both classes?   Is there any reason why the non-resident consignee should be exempt from a burden which, under circumstances in every respect similar, the resident consignee must pay?   To store and take care of such

property is equally beneficial to the non-resident as to the resident consignee. Why, then, should not each be subject to like charges, and why should the legislature discriminate between them? The result of the doctrine now contended for by defendant in error, if carried out, would be manifestly so unjust to the citizens of our own state that we cannot attribute to the legislature any such intention.

But the construction contended for would also create a distinction between consignees residing in this state. Goods shipped or consigned to a person residing upon the line of the company's railroad would be subject to charges for storage if permitted to remain in the company's warehouse more than two days after their arrival, while goods consigned to a person not residing upon the line, and which would have to be transferred to some other carrier for delivery to the final consignee, would not be subject to any charge for storage, no matter how long they were permitted to remain in the company's warehouse. It is also a well known fact that at the time of the granting of this charter by the legislature there were no lines of railroad running east from Detroit. Goods carried over the line of the Michigan Central Railroad consigned to Buffalo and points east of Detroit could only be shipped from thence by water. It very frequently happened that serious delays occurred in the shipments from Detroit on account of storms, and that about the time navigation would close each season there would be goods awaiting shipment which would have to remain and be stored until the opening of navigation the next season. All these facts were well known, and it cannot be supposed that the legislature intended the railroad company should store and take care of the goods so awaiting delivery under such circumstances without any compensation therefor. The language should be clear and explicit to warrant us in coming to such a conclusion.

We now come to the proviso in the sixteenth section under which it is insisted the company is responsible in this case. That proviso reads "that in all cases the said com-

pany shall be responsible for goods in deposit in any of their depots awaiting delivery, as warehousemen and not as common carriers."

While in examining this proviso we must not extend it beyond its general scope and object, neither must we limit it unless we are satisfied that such a limitation was intended. We must also examine it in the light of those provisions which precede it and of which it forms a part. As was said in *Railroad Co. v. Hale*, 6 *Mich.*, *243*, the legislature by this proviso "designed to adopt a certain and independent rule relative to the liability of this company, to avoid the uncertainties of the common law." What uncertainties were to be avoided? Suppose the railroad company carries goods over its line consigned to Buffalo and to be delivered in Detroit to another carrier for transportation across Lake Erie, and that this latter carrier, on account of a storm, is unable to take the goods for a period of ten days after their arrival in Detroit; is the railroad company during all this period to remain liable as common carrier for the safety of these goods? Or, suppose the lake carrier refuses to receive the goods, how long shall the railroad company be required to store them, and shall it be liable as a common carrier, or as a warehouseman for their safety? It may be said, however, that the company, by giving notice, and after the lapse of a reasonable time thereafter, could terminate its liability as a common carrier. But to whom shall this notice be given, to the next carrier or to the ultimate consignee? And what shall be considered a reasonable time after the service of such notice? It is apparent that there would be considerable uncertainty surrounding these and other questions likely to arise. The question as to what would or would not be a reasonable time, is one that from the very nature of things must be always uncertain; each case must and would depend upon its own peculiar circumstances. It is clear, therefore, that where goods are awaiting delivery, either to an intermediate or final consignee, it would in many cases, if not always, be difficult to say just

when the company's liability as a common carrier ceased, and its liability as warehouseman began. And this difficulty would be increased from the fact that under the previous provisions of section sixteen, storage could not be collected until more than four days had elapsed after the delivery of the goods in their warehouse in Detroit, and at all other stations on their road until after two days. Under such a provision it would be insisted that the company could not hold the goods in any case as warehousemen until the time had elapsed entitling them to charge and collect storage. It was therefore to avoid these uncertainties and to prevent such a construction as last suggested that this proviso was inserted, and it was intended to apply to all goods awaiting delivery, either to the intermediate or final consignee. The reasons for applying it in the one case are equally applicable in the other. We have already said that the company could collect charges for the transportation of goods which were to be delivered to another carrier for farther transportation, and that it could also collect storage upon such goods while awaiting delivery, the same as upon goods awaiting delivery to the final consignee. Such being the case, we fail to discover any good reason why the liability of the company should not be as clearly defined in the one class as in the other. No good or sufficient reason has been assigned why the legislature in the case of resident consignees should exempt the company from its extraordinary liability as a common carrier for the loss of goods awaiting delivery, and in the case of non-resident consignees, under similar circumstances in all other respects, hold the company liable. Ordinarily it is not expected that legislation will be less favorable to our own citizens than to those of a sister state or foreign country.

It is, however, insisted that the words "awaiting delivery" exclude goods which are to be transported over some other line, as such goods are not awaiting delivery, but awaiting transportation; and counsel insist that such was the decision in *Railroad Co. v. Hale*. The court there said "goods

are on deposit in the depot of the company, either awaiting transportation or awaiting delivery. This section has reference only to goods which have been transported and placed in the company's depots for delivery to the consignee." This language of the court does not warrant the construction which counsel attempt to give it. The court clearly classifies all goods as either awaiting transportation or awaiting delivery. The first includes all goods received and which are awaiting transportation by the company over its own line of road, the second all goods which have been carried by the company and are awaiting delivery, either to the intermediate or final consignee. Goods which have been transported by the company and placed in its depots for delivery are awaiting delivery to the consignee, even although they are to be taken by another carrier for transportation to some other place. In this case the person to whom the flour was shipped at Buffalo was the final or ultimate consignee, while the transportation company whose duty it was to receive the flour at Detroit and carry it from thence to Buffalo, was the intermediate consignee. This intermediate consignee was entitled to possession of this flour at Detroit, and had the railroad company refused to deliver the same could have maintained an action therefor. Such intermediate consignees have been long known and recognized in the law.—See *Abbott on Shipping, 421; Canfield v. The Northern R. R. Co., 18 Barb., 588; Strong v. Grand Trunk R. R. Co., 15 Mich., 216.*

We are of opinion, therefore, that the flour at the time it was destroyed was in the railroad company's depot awaiting delivery, and that under section sixteen of the charter the company is responsible for the loss thereof as warehousemen and not as common carriers.

We were referred to *Mills v. Mich. Central R. R. Co., 45 N. Y., 622,* and *Mich. C. R. R. Co. v. Mineral Springs Mfg. Co., 16 Wall., 318,* as holding a contrary doctrine. We have examined these cases and are of opinion that the reasons therein stated are not sufficient to warrant

us in coming to a conclusion in this case different from that arrived at in *Michigan Central R. R. Co. v. Hale*. We have always considered the question as settled by the decision in that case, and such has also been the understanding of the members of the bar throughout the state. The conclusion there arrived at has never been questioned before the commencement of the action in this case. Under this view the other questions discussed become unimportant.

The judgment must be reversed, with costs, and a new trial ordered.

The other Justices concurred.